WOOD BALMFORTH LLC
Mary Anne Q. Wood (#3539)
Jared M. Asbury (#12435)
60 East South Temple Street, Suite 500
Salt Lake City, Utah  84111
Telephone:  (801) 366-6060
Facsimile:  (801) 366-6061
mawood@woodbalmforth.com
jmasbury@woodbalmforth.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID G. CARLILE,<br><br>　　　Plaintiff,<br><br>vs.<br><br>RELIANCE STANDARD LIFE INSURANCE COMPANY and RELIANCE STANDARD LIFE INSURANCE POLICY NUMBER LTD 123420,<br><br>　　　Defendants. | **COMPLAINT**<br><br>Case No. _____<br><br>Judge: _____ |

　　　Plaintiff David G. Carlile brings this Complaint under the Employee Retirement Income Security Act, 29 U.S.C.A. §§ 1001 to 1461 ("ERISA") for recovery of disability benefits due him, and other relief.  Mr. Carlile complains and alleges as follows.

### PARTIES, JURISDICTION AND VENUE

　　　1.　　Plaintiff Mr. Carlile is a citizen of the State of Utah and resides in Utah.

　　　2.　　Defendant Reliance Standard Life Insurance Company is an Illinois corporation, domiciled in Illinois, with its administrative offices in Philadelphia, Pennsylvania ("Reliance").

3. Reliance provides insurance products and services, primarily in the area of employee benefits. Reliance is authorized to do business in Utah and has an office in Utah.

4. Defendant Reliance Standard Life Insurance Company Policy Number LTD 123420 (the "Plan") is a group long term disability policy sold by Defendant Reliance to Mr. Carlile's former employer, Lighthouse Resources, Inc. ("Lighthouse"). A copy of the Plan is attached as Exhibit A.

5. The Plan is an "employee welfare benefit plan" within the meaning of ERISA. Reliance insures benefits under the Plan and makes all claims determinations under the Plan.

6. Mr. Carlile is a participant in the Plan, and is claiming benefits under the Plan.

7. Mr. Carlile has exhausted all administrative remedies.

8. Mr. Carlile is entitled to benefits of $10,000 per month until he is no longer disabled, or until he reaches age 66. Mr. Carlile's short-term disability benefits were exhausted in September 2016. As of this date, he remains disabled. The amount at issue therefore exceeds $75,000.

9. This Court has subject matter jurisdiction under 29 U.S.C. § 1331 and diversity jurisdiction under 29 U.S.C. § 1332.

10. Venue is proper under 29 U.S.C. § 1391(b)(2).

**FACTS**

11. Lighthouse owns and operates coal mines.

12. Beginning in 2012, Mr. Carlile was employed by Lighthouse as its Vice President of Marketing. It was Mr. Carlile's responsibility to, *inter alia*, develop all domestic marketing plans, identify and cultivate customers, maintain good customer relations, develop and maintain

relationships with vendors, transportation companies, investors, and the community at large, negotiate all domestic contracts, and manage performance of those contracts.

13.   Mr. Carlile had an employment contract, Exhibit B, which required Lighthouse to give him 90 days prior written notice of termination, and provided that Lighthouse had the option to pay Mr. Carlile for the 90-day period without requiring him to work.  *Id.* at ¶ 4(a)(iv).

14.   Changes in regulatory policy during the Obama administration had placed the entire American coal industry in financial difficulty, including Lighthouse.  In 2014, Mr. Carlile was given a 90-day notice of termination as part of Lighthouse's effort to reduce expenses.

15.   Mr. Carlile could have taken his notice period payout and left to seek other employment.  However, he chose to continue working until his termination date, hoping that finances would improve enough to allow Lighthouse to renew his contract.

16.   That was, indeed, what happened.  The termination notice was rescinded and Mr. Carlile's contract was renewed.

17.   In mid-March 2016, Lighthouse was again under extreme financial pressure.  Several employees were given termination notices, with termination to occur in 90 days, on June 20, 2016.

18.   Again, Mr. Carlile chose to remain and work until his termination date, June 20, 2016.  Mr. Carlile hoped that, once again, circumstances would permit Lighthouse to withdraw the termination notice and renew his contract.

19.   Mr. Carlile was one of two employees who chose to remain and continue working through their notice periods.  The remaining employees who received termination notices took their lump sum notice period salary and left for other employment.

20. During the notice period, Mr. Carlile worked as usual. He took two business trips, one in April and one in May. When Mr. Carlile was not traveling, he reported to the office on a daily basis and worked a full week.

21. Nor did Mr. Carlile use vacation days during that period, because he knew that – if the termination notice were not rescinded – he would be paid for his unused vacation time upon his termination.

22. Mr. Carlile knew that Lighthouse's President, Everett King, wanted to retain his services. In fact, Mr. King and Mr. Carlile had discussed the possibility of entering into a consultancy arrangement after June 20, 2016, if the shareholders could not be persuaded to retain Mr. Carlile as a regular employee.

23. Mr. Carlile had every incentive to work as hard, or harder, than ever, and to make himself indispensable. He did so, so that his contract might be renewed despite Lighthouse's straitened circumstances. His intention was to do so until June 20, 2016, when his termination would take place or his contract would be renewed.

24. However, on May 31, 2016, Mr. Carlile was diagnosed with prostate cancer. He worked through June 8, 2016, then left work to begin treatment for cancer, and has been subsequently unable to work.

25. Among other things, the cancer surgery has left him incontinent and without sufficient energy to perform any sustained work.

26. Mr. Carlile was terminated by Lighthouse at the end of the notice period, on June 20, 2016. His contract would not have allowed termination before that date.

27. On that date, he signed his separation agreement. Lighthouse then issued his final paycheck, which consisted of bonus pay for a very lucrative contract he had secured prior to his termination, a severance payment, and other payments. Mr. Carlile had already received payment for all his regular working hours at the beginning of the notice period.

28. Lighthouse paid, and Reliance accepted, premiums to cover Mr. Carlile's disability benefits through the end of June 2016.

29. In July 2016, Mr. Carlile applied to Reliance for benefits under a short-term disability policy that Lighthouse had secured. Mr. Carlile received those benefits. The material eligibility requirements for benefits under Reliance's short-term disability policy are the same as the material eligibility requirements under the Plan.

30. Mr. Carlile was also eventually determined by the Social Security Administration to be disabled, and entitled to SSDI benefits.

31. By letter dated October 13, 2016, Reliance notified Mr. Carlile that his short-term disability benefits were exhausted and that, if he wished to receive benefits under the Plan, he was required to make application for such benefits within 45 days. The letter promised that Mr. Carlile's claim would receive "prompt attention."

32. Only Mr. Carlile acted promptly, however. He faxed the required claims documentation to Reliance, including his authorization for Reliance to obtain his medical records, on October 18, 2016. Reliance's own record of its subsequent handling of that claim reeks of gamesmanship and bad faith, as follows.

33. At the time Mr. Carlile submitted his claim, ERISA regulations required Reliance to make any adverse benefits determination within 60 days of receiving a claim. That period was

shortened to 45 days as of December 19, 2016. An extension of that period was allowed only if necessitated by "matters beyond the control of the plan."  29 C.F.R. § 2560.503-1(f)(3).

34. But Reliance waited nearly a full month, until at least November 14, 2016, before even requesting medical records from Mr. Carlile's health care providers.  This delay – among other things, such as offering shifting rationales, failing to make clear exactly what kind of evidence would be required to support Mr. Carlile's claim, and failing to consider or mischaracterizing evidence which was submitted – violated ERISA regulations regarding the processing of disability claims.

35. Even as Reliance dragged its feet in requesting medical information, internal notes dated as early as November 18, 2016, show that Reliance had already formulated an intention to assert that Mr. Carlile was ineligible for benefits because his work for Lighthouse during the notice period was "voluntary."

36. For a participant to be eligible for benefits, the Plan required that he be "actively at work" at the onset of his disability.  That required only that the participant be performing his normal duties, and that he be a full-time employee.  "'Full-time' means working . . . for a minimum of 30 hours during a person's regular work week." Mr. Carlile was so employed until June 9, 2016.  The Plan makes no distinction regarding work that is "voluntary," whatever that means.

37. If Reliance intended to deny benefits based on lack of initial eligibility, Mr. Carlile's medical records were irrelevant.

38. Nevertheless, when Mr. Carlile's health care providers did not act more promptly than Reliance, itself, had acted, Reliance began sending follow up letters in late November 2016,

6

asserting that if the health care providers did not provide requested records, those providers would be responsible for depriving Mr. Carlile of benefits.

39. At the same time, another internal note dated January 18, 2017, indicated Reliance's intention not to pay at least one of Mr. Carlile's health care providers for the requested records because they were not "necessary" to Reliance's determination. Reliance intended to deny benefits – not based upon any medical determinations – but because Mr. Carlile had not been "actively at work" when he became disabled on June 9, 2016.

40. Copies of Reliance's correspondence with his health care providers were sent to Mr. Carlile. During its processing of his claim, Reliance's communication with Mr. Carlile suggested that Reliance was concerned about whether his medical condition was a qualifying disability, and not whether he was otherwise qualified for benefits on his last day of work, June 8, 2016.

41. Lighthouse had confirmed to Reliance in writing that Mr. Carlile was an employee eligible for benefits until his last day of work, and that his last day of work was no earlier than June 7, 2016.

42. This confirmation was made by Lori Miller, Lighthouse's Director of Human Resources. Ms. Miller made this confirmation with full knowledge that the Plan required an eligible employee to work at least 30 hours per week, and with knowledge that Mr. Carlile had done so.

43. On February 3, 2017, Reliance denied Mr. Carlile's claim. Reliance claimed that Mr. Carlile's actual termination had occurred when he received his notice of termination in

March, that his coverage therefore terminated on March 31, 2016, that his subsequent work was "voluntary," and that there was no record of his attendance after the notice of termination.

44. However, there was never any record of Mr. Carlile's attendance, even before the notice of termination. He was a Vice President, an exempt employee, who worked in close proximity to the President, who knew when Mr. Carlile was there, and when he was traveling for business.

45. Mr. Carlile never punched a time clock or submitted records of hours worked. The only "record" of his attendance consisted of his own requests for vacation days, which were then noted by the Human Resources Department.

46. Mr. Carlile's regular paycheck stubs, contained in Reliance's files and issued prior to the termination notice, showed no tabulation of hours worked. Lighthouse simply paid him his salary.

47. Mr. Carlile filed an appeal on March 15, 2017. Lori Miller, for Lighthouse, confirmed that Mr. Carlile had worked regularly until June 8, 2016, but that there would have been no attendance records because he was an exempt employee.

48. Reliance never asked Ms. Miller or Mr. Carlile, specifically, whether he had worked at least 30 hours per week during the notice period. Reliance never inquired as to whether Lighthouse or Mr. Carlile, in the absence of time cards, could produce some other evidence that he had met the minimum 30 hour per week requirement.

49. Had Reliance made such an inquiry, Mr. Carlile, Ms. Miller, Everett King, and others, all could have submitted sworn testimony that Mr. Carlile was working at least 30 hours per week during the notice period.

50. In fact, Mr. Carlile generally worked more than 40 hours per week, and had continued to do so during the notice period.

51. In the absence of specific inquiries about the 30 hour requirement, having already responded that Mr. Carlile was an eligible employee at the time he left work to begin cancer treatments, and believing that Reliance was concerned only about whether Mr. Carlile worked, at all, during the notice period, Lighthouse and Mr. Carlile submitted available records reflecting that he had worked during the notice period, consisting of his expense reimbursements for business trips taken during the notice period, and his final paycheck, issued subsequent to his June 20, 2016, termination agreement.

52. Nevertheless, on June 12, 2017, Reliance denied Mr. Carlile's appeal.

53. Reliance conceded that Mr. Carlile was "disabled" within the meaning of the Plan as of June 9, 2016, but continued to insist, without any supporting evidence, that his coverage had terminated on March 31, 2016.

54. Reliance dismissed his travel expense records, stating that they did not prove he was a full-time employee. Further, because he had not taken a business trip in the first few days of June (after his diagnosis of prostate cancer), Reliance maintained that, at the latest, his employment and his coverage terminated at the end of May 2016.

55. Reliance dismissed Mr. Carlile's final paycheck because it showed no payment for regular hours worked. However, Reliance's records show that it was fully aware that the payment for his regular hours had been made in March.

56. Mr. Carlile could not produce nonexistent time cards, but he and Lighthouse had confirmed that his work made him eligible until the end of June, 2016, and had produced what records existed.

57. There was no evidence that Mr. Carlile had **not** been an active employee during the notice period, or that his employment actually "terminated" in March 2016. There was no contractual basis for denying benefits because his work after the notice of termination work was "voluntary."

58. Reliance's contrary conclusions were unsupported, arbitrary, self-serving, and made in bad faith.

## FIRST CLAIM FOR RELIEF
**Claim to Recover Benefits Under the Plan Pursuant to 29 U.S.C.A. § 1132(a)(1)(B)**

59. Mr. Carlile incorporates by reference all foregoing paragraphs.

60. Mr. Carlile has fulfilled all conditions for receipt of benefits under the Plan, and has presented such evidence to Reliance.

61. Reliance has wrongfully denied Mr. Carlile's claim for benefits under the Plan. Reliance has made unsupported and false assumptions in its favor, failed to inform Mr. Carlile of its intended basis for denial of his claim, relied on shifting rationales, failed to inform him or Lighthouse of specific evidence it would accept to support his claim, has misconstrued the terms of the Plan in its favor, and has read requirements into the Plan which do not exist.

62. Reliance has acted in bad faith, and has ignored its regulatory obligations in its dogged determination to find a basis for denial of Mr. Carlile's claim.

63. Furthermore, Reliance's denial of Mr. Carlile's claim for benefits is a result, at least in part, of the conflict between Reliance's fiduciary obligations to participants when determining claims under the Plan, and its interest in maximizing its own profitability.

64. Reliance's denial of Mr. Carlile's claim for benefits is contrary to the terms of the Plan and contrary to the evidence and information submitted to Reliance.

65. Mr. Carlile is entitled to recover benefits under the Plan, and seeks recovery of those benefits in an amount to be determined.

66. Mr. Carlile has incurred, and will continue to incur, attorneys' fees, costs and expenses in bringing and prosecuting this action. Mr. Carlile is entitled to an award of such attorneys' fees, costs and expenses pursuant to 29 U.S.C.A. § 1132(g).

## SECOND CLAIM FOR RELIEF
### Declaratory Relief

67. Mr. Carlile incorporates by reference all previous paragraphs.

68. Mr. Carlile seeks an Order of the Court declaring that he met the "actively at work" requirement, and that he is entitled to benefits under the Plan.

## THIRD CLAIM FOR RELIEF
### Injunctive Relief

69. Mr. Carlile incorporates by reference all previous paragraphs.

70. Reliance classified Mr. Carlile's position as Vice President of Marketing as "sedentary." This determination was incorrect, but it was also immaterial to Reliance's initial denial of benefits. Reliance admitted that Mr. Carlile was disabled even from a "sedentary" position, and denied his claim on other grounds.

71. However, this determination may become material when Reliance begins paying benefits under the Plan.

72. In addition to his responsibilities in Lighthouse's office, Mr. Carlile's position required a great deal of physical activity, including frequent visits to coal mines and power plants, entertaining and participating with customers and prospective customers in various activities, hosting events, attending conferences as the Lighthouse representative, and making, one or two substantial business trips each month.

73. Indeed, when the Social Security Administration determined that Mr. Carlile was disabled, it correctly noted that his position required extensive travel and visiting active operations, such as power plants and mines, and that he would have to be fit for physically taxing requirements before he could return to his occupation. The SSA explicitly determined that Mr. Carlie's position was not a "desk job."

74. Mr. Carlile seeks an Order requiring Reliance to pay him disability benefits until he is physically able to return to his former occupation, properly classified.

WHEREFORE, Mr. Carlile prays that the Court enter judgment in his favor, and against Reliance, as follows:

A. By entering judgment requiring Reliance to pay Mr. Carlile all benefits due under the Plan, commencing with the first day such benefits were due and continuing through the date of judgment;

B. By entering judgment clarifying that Mr. Carlile has fulfilled all terms and conditions of the Plan for receipt of benefits, and that he is entitled to continue to receive benefits

in the absence of evidence supporting the conclusion that Plaintiff's condition has changed such that he is no longer totally disabled from his occupation, properly classified;

    C.    By awarding to Mr. Carlile his attorneys' fees, costs and expenses as provided under 29 U.S.C.A. § 1132(g); and

    D.    By awarding such other and further relief as is just and proper.

DATED this 20th day of September, 2017.

                WOOD BALMFORTH LLC

                /s/ Mary Anne Q. Wood
                Mary Anne Q. Wood
                Jared M. Asbury
                60 East South Temple Street, Suite 500
                Salt Lake City, Utah  84111
                Telephone:  (801) 366-6060
                mawood@woodbalmforth.com
                swood@woodbalmforth.com
                *Attorneys for Plaintiff*